IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
PADUCAH

| | |
|---|---|
| SHANE WADLEY, ) | |
| ) | |
| *Plaintiff,* ) | |
| v. ) | |
| ) | Case No. 5:20-cv-147 (TBR) |
| NATIONAL RAILWAY EQUIPMENT ) | |
| COMPANY, ) | |
| ) | |
| *Defendant.* ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Shane Wadley brings this action against his former employer, the National Railway Equipment Company ("NRE"). Before the Court is NRE's Motion for Summary Judgment (Mot. for Summ. J.), Dkt. 8. Plaintiff Shane Wadley has Responded (Resp.), Dkt. 9. NRE has replied (Reply), Dkt. 10. As such, this matter is ripe for adjudication. For the reasons that follow, Defendant NRE's Mot. for Summ. J., Dkt. 8, is **GRANTED IN PART** and **DENIED IN PART**.

**I.     FACTUAL BACKGROUND**

NRE is a railroad company that, among other things, inspects and repairs locomotives. *See* Compl., Dkt. 1, ¶ 7. In September of 2019, NRE hired Shane Wadley to work as an electrician at its facility located in Paducah, Kentucky. *See* Compl. ¶ 2; *see also* New Hire Form, Dkt. 8-2.

Just as one would imagine, NRE and Wadley discussed details about the job during the initial interview. For instance, they agreed that Wadley would work Monday through Friday, 7:00am to 3:30pm, with a thirty-minute lunch break, for a total of forty hours a week. *See* Wadley Dep., Dkt. 9-1, 19:3-8. NRE explained to Wadley that he would be compensated $24

1

per hour (adding up to $192 per day) and that he would be the only electrician on the crew. *See id.* 19:12-15; *see also* Holmes Dep., Dkt. 9-3, 20:23-25–21:1-2. As a result, Wadley understood that he would need to call his supervisors and let them know if he was going to be absent. *See* Wadley Dep. 22:1-4. It was also during that interview when NRE informed Wadley that this job came with ten paid vacation days and five paid sick days. *See id.*

Arguably, there might be some dispute about the extent to which the topic of attendance was discussed during the initial interview. According to Wadley, NRE did not say "much of anything" about "any unpaid time off," *see id.* 19:24–20:1, nor did NRE explain "how many days [Wadley] could be absent from work without getting into trouble," *see id.* 20:15–21:1-8. By contrast, Angela Holmes, NRE's Vice President of Human Resources, stated that she "had a verbal chat with [Wadley] about attendance in his interview and explained the way attendance works." Holmes Dep. 33:17-20; *see also* Resp. at 3.

Regardless of what exactly was said during Wadley's initial interview, NRE hired him. *See* Compl. ¶ 2; *see also* New Hire Form. Wadley started his job without any apparent problem.

Almost immediately thereafter, however, Wadley began to miss work with some regularity. In September, Wadley took 2 sick days, *see* Time Off Requests, Dkt. 8-8, at 14, and 2.5 vacation days, *see id.* at 15–17. In October, Wadley took 2.5 sick days, *see id.* at 19–21, and .5 vacation days, *see id.* at 18. In the month of October Wadley also had 1 unexcused absence, *see* Absence Report, Dkt. 8-9, at 40, and was tardy 3 times, *see id.* at 37–39. In November, Wadley had 1 unexcused absence, *see id.* at 32, and was tardy once, *see id.* at 33. In December, Wadley had 2 unexcused absences, *see id.* at 34–35, and missed one hour and fifteen minutes of work for an "appointment," *see id.* at 36. In his first four months on the job, Wadley used up 4.5

sick days, 3 vacation days, 4 tardies, 4 unexcused absences, and had an hour and fifteen minute long appointment, *see supra*.

That winter presented Wadley with more challenges than just making it to work. At the end of December, Wadley's son, a survivor of the Marshall County High School shooting, began to "have[] some [worsening] issues" with his PTSD. Wadley Dep. 23:25–24:1-17; *see also* Compl. ¶ 10. As a result, the Complaint asserts that Wadley became more of a "caregiver" for his son. Compl. ¶ 10. Then, in January, Wadley's mother was diagnosed with cancer. *See id.*; *see also* Wadley Dep. 20:9-17. Wadley maintains that he was "the only person here . . . that could help" his mother, which, because she couldn't drive, meant that Wadley assumed responsibility for tasks like driving her to appointments. *See* Wadley Dep. 27:4-12, 29:5-6.

Wadley claims that, intent on caring for his son and mother, and unsure about what these new obligations might mean for his job, he initiated a conversation with his NRE supervisors. *Id.* 24:15-25, 26:13-25. Wadley states that in February of 2022 he "told [his supervisors] everything that was going on and explained to them the situation." *Id.* 24:23-24. According to Wadley, he asked his supervisors "to just let [him] know" if "there [was] going to be an issue." *Id.* 24:25–25:1. Wadley, paraphrasing NRE's response, asserts that his supervisors told him "not to worry about the attendance," "to take care of [his] mother, [his] son, everything," and "to just keep them in the loop." *Id.* 25:11-14. On that basis, Wadley states that "[he] was led to believe [his attendance] would not be an issue, that if there was an issue, [NRE would] give [him] plenty of notice to fix it." *Id.* 25:2-5.

It's unsurprising, then, that in 2020 Wadley's absenteeism got worse. In January, Wadley took 4 sick days, *see* Time Off Requests at 1, 4, 8, a total of 8 vacation days, *see id.* at 2–3, 5–7, 9–10, and left early once, *see* Absence Report at 18. In February, Wadley took 3

vacation days, *see* Time Off Requests at 11–13, was tardy twice, *see id.* at 19, 21, and had 1 unexcused absence, *see id.* at 20. In March, Wadley was tardy once, *see id.* at 25, had 5 unexcused absences, *see id.* at 26–29, 31, had 1 excused absence, *see id.* at 30, and clocked out early once, *see id.* at 23.[1]

In April, when COVID-19 was running rampant across the country, Wadley suspected that he might have contracted the virus. On Monday, April 13, Wadley texted Holmes, saying that he "had a fever since Saturday night, had a bad cough and [was] just really tired the last couple of days." Holmes Dep. 36:22-25–37:1-2. Wadley stated in the text message that he "[did not] believe it [was] anything other than common flue or cold," but asked whether Holmes wanted him to "go ahead and go to work or get checked out at a doctor." *Id.* 37:2-5. Holmes told Wadley to "definitely . . . not go to work" and "to see if he could see a doctor." *Id.* 37:6-9. Wadley saw his doctor the next day and received a COVID-19 test. *Id.* 37:13-20. Wadley continued to miss work for the next two days, while he was waiting for his test results. *Id.* 37:21-25–38:1-6. And although Wadley's test results came back negative for COVID-19, the doctor still advised that Wadley quarantine for 14-days. *Id.* 38:12-25–39:1-2. Holmes told Wadley to follow the doctor's advice. *Id.* 39:6-12. Wadley therefore missed two weeks of work—from April 13 through April 26—for this COVID-19 situation. *See id.* 38:12-25–39:1-2.

Pursuant to the Emergency Paid Sick Leave Act ("EPSLA"), a law discussed *infra* Part III, NRE compensated Wadley for the two weeks he missed due to COVID-19 related conditions. *See* Compl. ¶ 18; *see also* Holmes Dep. 45:1-25–46:1-16. NRE based Wadley's

---

[1] Defendants state that between February and March, Wadley clocked out early twice. *See* Mot. for Summ. J. at 2. However, after reviewing the record the Court is only able to find one instance of Wadley clocking out early during that time period. *See* Absence Reports at 23. Perhaps this discrepancy results from a day in February when Wadley clocked back in from lunch at 12:33pm. *See id.* at 21. On that Absence Report Sheet, the information was written in the "Time Clocked Out" section rather than the "Time Clocked In" section, even though Wadley was technically returning to work. *See id.* Regardless, one more—or one less—early clock out does not affect the Court's analysis with respect to whether or not Wadley's behavior constitutes excessive absenteeism, *see infra* Part III.B.ii.

4

EPSLA pay on an average daily pay rate of $120 per day, which it calculated by taking Wadley's regular hourly rate and multiplying it by the five hours per day that Wadley averaged during the two weeks preceding the EPSLA leave. *See* Holmes Dep. 45:1-25–46:1-16.

With that calculation in mind, it's obvious that Wadley missed more time in April than just his two weeks of EPSLA leave. Not including his EPSLA leave, in the month of April Wadley also accumulated 9 excused absences, *see* Absence Reports at 1–8, and 1 unexcused absence, *see id.* at 24, none of which were related to COVID-19.

Wadley's absenteeism improved in the next two months. During May and June, Wadley was tardy 2 times, *see id.* at 11, 15, left early 3 times, *see id.* at 9–10, 13, and had 4 unexcused absences, *see id.* at 12, 14, 16–17.[2]

Despite Wadley's improved attendance, NRE terminated Wadley in June. *See* Holmes Dep. 15:19-22. NRE stated that it terminated Wadley "because of his attendance." *Id.*; *see also* Compl. ¶ 19; Warren Dep., Dkt. 9-4, 19:16-18. In total, from the time he started working at NRE, Wadley took 8.5 days of sick leave, 14 vacation days, had 15 unexcused absences, had 10 excused absences, and was tardy or departed early 14 times. *See* Time Off Requests; Absence Reports. Wadley maintains that his termination came as a surprise, because he "had [never] had any warnings or conversations about [his attendance] prior to that time." Wadley Dep. 66:17-24. This, Wadley contends, was contrary what NRE had told him in February: that "[NRE] would let [Wadley] know well in advance" if "there was ever a problem" with attendance. *Id.* 66:25–67:1-9; *see also id.* 24:23-25–25:1-14. Instead of receiving some warning, Wadley claims that when

---

[2] Defendants state that from May to June Wadley had 3 unexcused absences and 1 excused absence. *See* Mot. for Summ. J. at 2. It appears to the Court, however, that all 4 of Wadley's absences during this time period were unexcused. *See* Absence Reports. Nevertheless, whether this absence is classified as excused or unexcused, the Court's analysis is the same, *see infra* Part III.B.ii.

5

he had to miss work his supervisors would "normally . . . just say okay." Wadley Dep. 37:10-13; *see also id.*; Compl. ¶¶ 23–24.

What's more, Wadley maintains that NRE treated another employee with a history of absenteeism differently. *See* Compl. ¶ 21. That employee—Charles Pulley—allegedly used his last vacation day on February 26, 2020. *See* Pulley Timecards, Dkt. 9-5, at 9. Wadley alleges that Pulley was absent from work from May 31 through April 3, *see* Resp. at 9 (*citing* Pulley Timecards at 17–18), worked one day, *see id.* (*citing* Pulley Timecards at 19), and then was absent again from April 7 through April 13, *see id.* (*citing* Pulley Timecards at 19–20). Wadley also claims that Pulley worked short days on May 19, May 27, and June 22, *see id.* (*citing* Pulley Timecards at 29, 31, 37).[3] Wadley states that he learned from another co-worker, Walter Bromley, that Pulley was not terminated for these absences. *See* Wadley Dep. 52:8-13. Instead, Wadley states that Bromley told him that Pulley was only given a written warning. *See id.*

The parties dispute whether any of Pulley's absences were due to COVID-19 related conditions. Wadley claims that because Pulley worked on April 6, his absences before and after that date could not have been due to a COVID-19 related condition. *See* Resp. at 9 (*citing* Pulley Timecards at 19). NRE responds, stating that Pulley did in fact take leave under the EPSLA due to COVID-19. *See* Mot. for Summ. J. (*citing* Pulley Records, Dkt. 8-13, at 1–10).

Based on the facts above, Wadley is suing NRE on three counts: (1) violation of the EPSLA, *see* Compl. ¶¶ 26–32; (2) retaliation in violation of the EPSLA, *see id.* ¶¶ 33–36, and (3) common-law equitable estoppel, *see id.* ¶¶ 37–41.

---

[3] The Court notes, however, that the record seems to indicate that Pulley worked a full 8 hours on June 22. *See* Pulley Timecards at 37.

## II. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matshushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). The plaintiff may accomplish this by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . " Fed. R. Civ. P. 56(c)(1). Neither "conclusory allegations" nor "speculation" nor "unsubstantiated assertions" will suffice to defeat a motion for summary judgment. *Jones v. City of Franklin*, 677 F. App'x 279, 282 (6th Cir. 2017). "[T]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

### III. DISCUSSION

#### A. *The Emergency Paid Sick Leave Act*

One major provision of the Families First Coronavirus Response Act ("FFCRA"), 29 U.S.C. § 2601 *et seq.*, is the Emergency Paid Sick Leave Act ("EPSLA").[4] The EPSLA requires covered employers to provide paid sick leave to employees who are unable to work or telework due one of six qualifying COVID-19-related conditions. *See id.* §§ 5102 and 5110(2). Full-time employees are entitled to 80 hours of paid sick leave while part-time employees are entitled to paid sick leave for "a number of hours equal to the number of hours that such employee works, on average, over a 2-week period." *See id.* § 5102(b)(2). A full-time employee, for the purposes of this law, is one who "is normally scheduled to work at least 40 hours each workweek." 29 C.F.R. § 826.21(a)(2).

On Monday, April 13, 2020, Wadley reported that he "had a fever since Saturday night, had a bad cough and [was] just really tired the last couple of days." Holmes Dep. 36:22-25–37:1-2. Angela Holmes, one of Wadley's supervisors, told Wadley to "not go to work" and directed him "to see if he could see a doctor." *Id.* 37:6-9. Wadley followed those instructions, saw a doctor, and tested negative for COVID-19. *Id.* 37:13-25–38:1-6. Still, though, the doctor advised that Wadley quarantine for 14-days. *Id.* 38:12-25–39:1-2. Holmes told Wadley to follow the doctor's advice. *Id.* 39:6-12. This quarantine caused Wadley to miss two weeks of work—from April 13 through April 26. *See id.* 38:12-25–39:1-2.

The parties agree that NRE is a covered employer and that Wadley was an employee there. *See* Mot. for Summ. J. at 8–10; *see also* Resp. at 10. The parties also agree that Wadley suffered from a qualifying COVID-19 related condition while employed at NRE. *See* Mot. for

---

[4] The EPSLA expired on December 31, 2020. *See* FFCRA § 5109. However, Wadley took time off due to COVID-19 concerns in April of 2020, when the law was still in full effect. *See* Compl. ¶ 17.

Summ. J. at 8–10; *see also* Resp. at 10.  They part ways, however, in determining just how much paid sick leave Wadley is entitled to.  NRE argues that "Wadley was not a full-time employee" because "he was not regularly working 40 hours a week."  Mot. for Summ. J. at 8.  So, NRE's argument goes, Wadley's EPSLA pay should be calculated according to the average number of hours per day that Wadley worked in the two weeks prior to his sick leave.  *See id.* at 8–10; *see also* Holmes Dep. 45:21-25–46:1-16.  And because Wadley averaged five-hour workdays in the two weeks leading up to his leave, NRE contends that Wadley's EPSLA pay should be for 50 hours of work rather than for 80 hours of work.  *See* Mot. for Summ. J. at 8–10; *see also* Holmes Dep. 45:21-25–46:1-16.  For his part, Wadley maintains that he was "plain[ly]" a "full-time [e]mployee."  *See* Resp. at 11.  To support this argument, Wadley claims that he was "scheduled to work at least 40 hours each workweek," what a full-time employee would work.  *See id.* (emphasis omitted).  Thus, Wadley concludes that he is entitled to 80 hours of EPSLA pay, not 50 hours.  *See id.* at 11–12.

Accordingly, the question before the Court turns on whether Wadley was a full-time employee under the EPSLA.  The Court was not able to find, nor did the parties cite, any case directly on point.[5]  It is fortunate, therefore, that the EPSLA's language is both clear and precise.

*Scheduled to work*—that's the operative language here.  The EPSLA states that an employee's paid sick leave should be calculated based on "the number of hours [he] would otherwise be normally *scheduled to work*."  *See* FFCRA § 5110(2) (emphasis added).  And an

---

[5] Surprisingly, it appears that no case—let alone one binding on this Court—has dealt with this specific issue before. Numerous courts have addressed issues about other parts of the EPSLA. *See, e.g.*, *Haney-Filippone v. Agora Cyber Charter Sch.*, No. CV 20-5303, 2021 WL 1853434, at *6 (E.D. Pa. May 10, 2021) (determining whether a particular defendant fits within the definition of a covered employer); *Valdivia v. Paducah Ctr. for Health & Rehab.*, LLC, 507 F. Supp. 3d 805, 810 (W.D. Ky. 2020) (discussing the role of exclusions to the EPSLA); *Gracia v. L. Offs. of Alexander E. Borell, P.A.*, No. 6:20-CV-1544-PGB-GJK, 2021 WL 1881664, at *2 (M.D. Fla. Apr. 19, 2021) (deciding whether a defendant violated the EPSLA when it terminated plaintiff after she was potentially exposed to COVID-19).  But those cases provide little guidance for this particular issue.

9

employee is considered to be full-time if he is "normally *scheduled to work* at least 40 hours each workweek." 29 C.F.R. § 826.21(a)(2) (emphasis added).  Here, *scheduled to work* means exactly what it sounds like.  The most natural reading of the statutory language uses "scheduled" as a past participle, which expresses a completed action.  Webster's Third New International Dictionary: Unabridged 1653 (1971).  As such, the Court defines *scheduled* as "to appoint, assign, or designate to do or receive something at a fixed time in the future."  *Id.* at 2028.  The use of the infinitive *to work* means "engaged in working (as one's occupation)."  *Id.* at 2643.

So, did NRE normally designate Wadley to work his job for at least 40 hours a week? Wadley certainly thinks so, and NRE does not seem to dispute that point.

Wadley states that he was scheduled to work Monday through Friday, 7:00am to 3:30pm, with a thirty-minute lunch break.  *See* Wadley Dep., Dkt. 9-1, 19:3-8.  That adds up to 40 hours a week.  *See id.*  According to Wadley, this was his schedule for every week, including the two weeks from April 13 through April 26.  *See id.*  Wadley admits that he did not always work 40 hours a week.  *See id.* 35:20-24; *see also* Time Off Requests; Absence Reports.  But Wadley maintains that his absences did not affect how often he was scheduled to work.  *See* Wadley Dep. 66:8-16. NRE seems to agree, stating that "[e]verybody is full time," *see* Holmes Dep. 27:23-24, and that Wadley's job "was a full-time job," *see id.* 33:23-24.  Rather, NRE states that it "hired Wadley to be a full-time employee, [but] that is clearly not what transpired."  *See* Mot. for Summ. J. at 9–10.  The record therefore indicates that Wadley has presented evidence on which the trier of fact could reasonably find for the plaintiff.

Consequently, NRE's motion for summary judgment is denied as it pertains to the count one of Wadley's Complaint.

B. *Retaliation*

The EPSLA prohibits employers from retaliating against employees for taking sick leave due a qualifying COVID-19-related condition. *See* 29 U.S.C. §§ 5102 and 5110(2). And because the EPSLA relies on the Fair Labor Standards Act ("FLSA") for its enforcement provisions, courts use the FLSA *McDonnell-Douglas* framework to evaluate EPSLA claims. *See Kovacevic v. Am. Int'l Foods Inc.*, No. 1:21-CV-72, 2021 WL 3629756, at *4 (W.D. Mich. Aug. 17, 2021); *see also Kofler v. Sayde Steeves Cleaning Serv., Inc.*, No. 8:20-CV-1460-T-33AEP, 2020 WL 5016902, at *2 (M.D. Fla. Aug. 25, 2020) ("Although the FLSA and FFCRA are different statutes, retaliation for asserting rights under the FFCRA violates the FLSA.").

The *McDonnell-Douglas* framework is: First, the employee carries the initial burden of establishing a prima facie case of retaliation. 411 U.S. 792, 802 (1973). If the employee establishes a prima facie retaliation case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions. *See id.* If the employer meets this burden, then the burden shifts back to the employee to demonstrate that the employer's explanation is a pretext for discrimination. *See id.* at 804.

i. *Plaintiff's prima facie case for retaliation*

To establish a prima facie case of retaliation, an employee must show that: "(1) [he] was engaged in an activity protected by the [EPSLA];" (2) "the employer knew that [he] was exercising [his] rights under the [EPSLA];" (3) "after learning of the employee's exercise of [EPSLA] rights, the employer took an employment action adverse to [him];" and (4) "there was a causal connection between the protected [EPSLA] activity and the adverse employment action." *Killian v. Yorozu Auto. Tennessee, Inc.*, 454 F.3d 549, 556 (6th Cir. 2006).

Wadley maintains that he has set out a prima facie case. Specifically, Wadley argues that (1) Wadley's leave was a protected activity under the EPSLA; (2) NRE knew that Wadley was taking sick leave under the EPSLA; (3) the NRE terminated Wadley after it learned of his sick leave; and (4) the temporal activity between Wadley's sick leave and the termination establishes causation. *See* Resp. at 13–14.

Although NRE "disputes" whether Wadley established a prima facie case of retaliation, it never provides any argument as to why Wadley does not meet any of the four prima facie elements. *See* Mot. for Summ. J. at 5. However, it does not appear that NRE challenges any of the first three elements of Wadley's prima facie case—indeed, NRE agrees that Wadley is owed some EPSLA pay, and NRE admits that it fired Wadley after he took EPSLA sick leave. *See id.* at 8–10. Thus, NRE only appears to dispute the fourth element: whether there was a causal connection between the protected activity and the adverse employment action. *See id.*

Closeness in time between the protected activity and the adverse action is "strong evidence" that the protected activity was the likely reason for the adverse action. *Pettit v. Steppingstone, Ctr. for the Potentially Gifted*, 429 F. App'x 524, 533 (6th Cir. 2011). "[P]revious cases that have permitted a prima facie case to be made based on the proximity of time have all been short periods of time, usually less than six months." *Parnell v. West*, 114 F.3d 1188 (6th Cir. 1997). But "temporal proximity, standing alone, is not enough to establish a causal connection." *Spengler v. Worthington Cylinders*, 615 F.3d 481, 494 (6th Cir. 2010). Temporal proximity combined with "other evidence of retaliatory conduct" can be sufficient to prove the fourth element of a prima facie case. *Pettit*, 429 F. App'x at 533. "One example of such sufficient, additional evidence is evidence of disparate treatment." *Id.* (*citing Cantrell v. Nissan N. Am. Inc.*, 145 Fed. Appx. 99, 105–06 (6th Cir. 2005)).

The period of time between Wadley's EPSLA leave and his termination supports causal connection because it is significantly "less than six months." *See Parnell*, 114 F.3d at 1188. Wadley took EPSLA leave from April 13, 2020, through April 26, 2020, and NRE terminated him on June 19, 2020. *See* Wadley Dep. 17:13-16, 44:14-19. This period of time between the EPSLA leave and the termination totals seven weeks and four days, about a month and a half. *See* Resp. at 13. The temporal proximity here presents strong evidence that a causal connection exists in this case. *See Parnell*, 114 F.3d at 1188; *see also Martin v. Loomis Armored US, Inc.*, No. 3:08-0418, 2009 WL 1956685, at *10 (M.D. Tenn. July 7, 2009) ("[A] span of four months or more between protected activity and adverse action, without some additional compelling evidence of retaliation, is insufficient to establish the required causal connection.").

Additionally, Wadley alleges "disparate treatment." *See* Compl. ¶¶ 20–21. According to the Complaint, another employee, Charles Pulley, "was permitted to take off whenever he wanted" and only received a "warning" for his absenteeism. *See id.*; *see also* Wadley Dep. 52:8-13. NRE argues that Wadley's allegations about Pulley "cannot serve as an argument supporting pretext," but it never suggests why this evidence of disparate treatment cannot be used to establish a prima facie case of retaliation. *See* Mot. for Summ. J. at 8. The Court therefore addresses NRE's concerns about Wadley's references to Pulley in the pretext section, *infra* Part III.B.iii.[6] Accordingly, in the absence of any challenge from NRE, the Court concludes that Wadley's allegation of disparate treatment, combined with temporal proximity, satisfies the causal connection requirement.

---

[6] NRE argues that the Court cannot consider information about Charles Pulley because it is based on hearsay. *See* Mot. for Summ. J. at 7–8. The Court concludes that NRE's argument does not affect its analysis here. As explained, *infra* Part III.B.iii, the Court will not consider the hearsay issue at this time because neither party has discussed whether the hearsay would be admissible. And here, the Court is hesitant to let an issue that can be revisited at future proceedings lead to summary judgment on a claim. What's more, Pulley has since produced evidence showing when exactly Pulley was absent. *See* Pulley Timecards. Therefore, at this time, the Court is comfortable letting the allegation of disparate treatment play a role in its prima facie case analysis.

13

The Court concludes that Wadley has established a prima facie case and raised an inference that his termination was retaliatory.

>	ii.	*Defendant's proffered reason for terminating Plaintiff*

Once a plaintiff has established a prima facie case, the employer must "articulate some legitimate, nondiscriminatory reason" for its actions. *See McDonnell-Douglas*, 411 U.S. at 802. NRE maintains that it has articulated a legitimate reason for Wadley's termination. *See* Mot. for Summ. J. at 5–6. That is, NRE states that it "terminate[d] Wadley due to absenteeism" so bad that "Wadley [was] no longer . . . a full[-]time employee." *Id.* at 6.

There is no question that in the Sixth Circuit excessive absenteeism is a legitimate reason to terminate an employee. *See Norton v. LTCH*, No. 13-CV-13730, 2014 WL 4926204, at *6 (E.D. Mich. Oct. 1, 2014), *aff'd*, 620 F. App'x 408 (6th Cir. 2015) ("Excessive absenteeism is a legitimate reason to terminate an employee."); *Townley v. Blue Cross & Blue Shield of Michigan*, 254 F. Supp. 2d 661, 670 (E.D. Mich. 2003) ("Absenteeism is a legitimate, nondiscriminatory reason for terminating an employee."); *Summerville v. ESCO Co.*, 52 F. Supp. 2d 804, 813 (W.D. Mich. 1999) ("The Court agrees that regular attendance is a minimum function of almost any job and that excessive absenteeism is a legitimate reason to terminate an employee.").

In the nine months that Wadley worked at NRE, he totaled fifteen unexcused absences and fourteen instances of being tardy or clocking out early. *See* Time Off Requests; Absence Reports; *see also* Mot. for Summ. J. at 5. Those figures do not include vacation days, personal/sick days, or EPSLA leave. *See* Mot. for Summ. J. at 5; *see also* Time Off Requests; Absence Reports. This absenteeism surpasses the threshold that other courts have found to be "excessive." *See, e.g.*, *Summerville*, 52 F. Supp. 2d at 807, 813 (finding that an employee's

sixteen unexcused absences during a one-year time-period supported a finding of excessive absenteeism). Indeed, that many unexcused absences can create significant hardships for the employer and the other employees showing up to work. *See generally Rush v. McDonald's Corp.*, 966 F.2d 1104, 1115 (7th Cir. 1992) ("Reliability and promptness are important considerations in maintaining a work force."). Because NRE purportedly terminated Wadley for his absenteeism, which was in fact excessive, the Court finds that NRE has asserted a legitimate, nondiscriminatory reason for Wadley's termination.

Wadley argues that the excessive absenteeism justification for his termination is not legitimate because NRE represented that he would be notified before his absences became a problem. *See* Resp. at 16–17. Wadley therefore concludes that NRE "is estopped from claiming that Mr. Wadley's attendance justified his termination because he relied on its representations." *Id.* at 16. However, Wadley's argument does not change that fact that he was excessively absent, nor does it change the fact that in the Sixth Circuit excessive absenteeism is a legitimate reason to terminate an employee. Therefore, Wadley's argument is better understood as this: because of NRE's representations, it is clear that the proffered reason for termination (excessive absenteeism) was not the actual reason for termination. *See id.* at 16–17. This argument is better addressed in the pretext step of the *McDonnell-Douglas* framework, and the Court discusses it there, *see infra* Part III.B.iii.

       *iii.* <u>*Whether Defendant's proffered reason was pretext to retaliation*</u>

Once a plaintiff successfully alleges a prima facie case of retaliation, and once the employer articulates a legitimate, non-discriminatory reason for the challenged employment action, the plaintiff must produce sufficient evidence to create a genuine issue of material fact

15

regarding whether each of the defendant employer's articulated reasons is pretextual. *McDonnell-Douglas*, 411 U.S. at 804.

A plaintiff can establish pretext by showing either "(1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate [his] discharge, or (3) that they were *insufficient* to motivate discharge." *See Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008) (emphasis in original) (*quoting Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994)).

Wadley makes two arguments as to why NRE's proffered reason did not actually motivate his discharge. First, Wadley claims that NRE represented that it would provide a warning before attendance became an issue. *See* Resp. at 16. Wadley alleges that he relied on that representation and never received a warning, which, he maintains, "estop[s] [NRE] from claiming that Mr. Wadley's attendance justified his termination." *Id.* Second, Wadley contends that NRE treated Charles Pulley, another employee with a history of absenteeism, differently. *See* Compl. ¶¶ 20–21; *see also* Resp. at 9.

Let's take Wadley's estoppel argument first. When a defendant terminates an employee for excessive absenteeism, a plaintiff can demonstrate pretext by providing evidence that it was his understanding that he would receive a formal warning that his conduct was perceived as being chronically late or absent. *Compare Jones v. Roadway Exp., Inc.*, No. CIV. A. 99-2198-GTV, 2000 WL 1114968, at *7 (D. Kan. July 17, 2000) (finding that plaintiff had demonstrated a genuine issue of material fact as to whether the defendant's proffered reason (excessive absenteeism) was pretextual because "[p]laintiff maintains that it was his understanding that he would receive a written warning if he was perceived as being chronically late or absent"), *and Ritchie v. Aker Kvaerner Songer, Inc.*, No. 6:07-CV-00959, 2009 WL 10705555, at *6 (S.D.W.

16

Va. Nov. 13, 2009) (finding that there was enough evidence for a reasonable jury to find the defendant's actions were pretextual because "the defendant's policies required a verbal and written reprimand before termination . . . [and] [defendant] was never reprimanded in any way), *with Dixon v. Bryson*, No. 4:10-CV-00072-SEB, 2013 WL 1137506, at *8 (S.D. Ind. Mar. 18, 2013) (finding that plaintiff did not show pretext because "it [was] undisputed that there was no requirement" for the defendant to "give[] sufficient warnings"), *and Schmidt v. Runyon*, 20 F. Supp. 2d 1246, 1249 (C.D. Ill. 1998) (finding the fact that plaintiff "was unaware or was never informed that it was more serious for him to miss" particularly workdays to be "irrelevant," because, in part, plaintiff did not expect a warning prior to termination); *see also Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1049 (6th Cir. 1998) (finding that the fact that "[p]laintiff was not warned that she was about to be terminated" did not tend to show pretext, though the plaintiff never alleged that she was entitled to a warning).

Wadley claims that in February of 2022 he "told [his supervisors] everything that was going on [with his mother and son] and explained to them the situation." *Id.* 24:23-24.  In that conversation, Wadley maintains that he asked his supervisors "to just let [him] know" if "there [was] going to be an issue." *Id.* 24:25–25:1.  And according to Wadley, his supervisors told him something to the effect of: "[don't] worry about the attendance," just "take care of [your] mother, [your] son, everything," and be sure to "keep [us] in the loop." *Id.* 25:11-14.  On that basis, Wadley states that "[he] was led to believe [his attendance] would not be an issue, that if there was an issue, [NRE would] give [him] plenty of notice to fix it." *Id.* 25:2-5.  NRE does not explicitly dispute the assertion made by Wadley, nor does NRE provide evidence tending to disprove that the conversation occurred.  *See* Mot. for Summ. J.; *see also* Reply.  However, Wadley alleges that when he had to miss work his supervisors would "normally . . . just say

17

okay." Wadley Dep. 37:10-13; *see also id.*; Compl. ¶¶ 23–24. This, Wadley asserts, is not the type of notice that NRE stated it would provide.

Therefore, assuming that NRE terminated Wadley for his excessive absenteeism, issues of fact remain as to whether Wadley was to receive a warning prior to being terminated and whether Wadley did in fact receive that warning. Should a jury decide that Wadley was entitled to such a warning, and that NRE fired him without a warning, the proffered reason would not be legitimate and would in fact be pretextual.

Up next is Wadley's comparison to another employee. NRE makes two arguments as to why this comparison to Charles Pulley must fail. First, NRE contends that the Court must reject this evidence because it is hearsay, and "hearsay evidence 'may not be considered on [a motion for] summary judgment.'" Mot. for Summ. J. at 8 (*quoting Wilson v. Dana Corp.*, 210 F. Supp. 2d 867, 872 (W.D. Ky. 2002)). Wadley does not respond to this argument. *See* Resp.

It is well-established that a court may not consider inadmissible hearsay when deciding a summary judgment motion. *See Tranter v. Orick*, 460 F. App'x 513, 514 (6th Cir. 2012) (collecting cases). Courts at summary judgment may consider hearsay evidence if its "content [is] admissible." *Bailey v. Floyd Cnty. Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997).

The Court declines to consider the hearsay issue at this time. Neither party has addressed whether this hearsay evidence would be admissible. NRE, for its part, misstates the law, arguing that the evidence must be excluded simply because it is hearsay. *See* Mot. for Summ. J. at 8. And Wadley, for his part, does not respond to this specific point. *See* Resp. Because the parties will have the opportunity to address the admissibility of this evidence before trial, and because Wadley's estoppel argument establishes a genuine dispute of material fact with regard to pretext, the Court does not consider the hearsay argument here. That said, the Court does note that

Wadley produced Pulley's timecards in response to NRE's motion for summary judgment. *See* Pulley Timecards.

Second, NRE argues that "Wadley's pretext argument must fail as a matter of law" because "Pulley was in the same 'protected class' as Wadley," i.e., both Pulley and Wadley took EPSLA leave due to COVID-19 related conditions. *See* Mot. for Summ. J. at 7 (*quoting Berry v. Maker's Mark Distillery, Inc.*, No. 3:12CV-185-JHM, 2014 WL 1761922, at *15 (W.D. Ky. Apr. 30, 2014)). Wadley first disputes whether Pulley actually took EPSLA leave. *See* Resp. at 9 (*citing* Pulley Timecards at 19). Wadley also responds that "the protected class for FLSA purposes is simply 'employees,' " so even though "[b]oth employees are within the protected class . . . the retaliation remains illegal." *Id.* at 15.

The Court agrees with Wadley on this point. A plaintiff produces a comparator to show evidence of discriminatory intent, but discrimination is not an issue in today's case. *See, e.g.*, *Kunik v. New York City Dep't of Educ.*, 436 F. Supp. 3d 684, 697 (S.D.N.Y. 2020) ("To establish an inference of discriminatory intent through disparate treatment, a plaintiff must allege that she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.") (quotations omitted). Rather, Wadley is comparing his situation to Pulley's situation to further demonstrate that NRE's proffered reason was pretextual. *See* Compl.; *see also* Resp. The fact that Pulley might have also taken EPSLA leave could possibly reduce the persuasiveness of Wadley's argument here, but that is not grounds to grant summary judgment. Regardless, the Court already finds that Wadley has demonstrated a genuine issue of material fact as to whether he was entitled to a warning before being terminated.

Accordingly, NRE's motion for summary judgment is denied as it pertains to count two of Wadley's Complaint.

### C. *Collateral Estoppel*

Count III of Wadley's Complaint sets out a claim based on common-law equitable estoppel. *See* Compl. ¶¶ 37–41. NRE argues that "[t]his claim must fail as a matter of law" because "equitable estoppel is not a separate claim for damages." Mot. for Summ. J. at 10 (*quoting Shane v. Bunzl Distrib. USA, Inc.*, No. 3:01CV-272-S, 2004 U.S. Dist. LEXIS 27826, *12 (W.D. Ky July 20, 2004)). Wadley now concedes this point, stating that "[NRE] is correct that" equitable estoppel "should not have [been] pleaded . . . as a separate count." Resp. at 16. Because Wadley now admits that his equitable estoppel claim cannot stand alone, the Court grants NRE's motion for summary judgment as it pertains to Count III of Wadley's Complaint.

To the extent that Wadley incorporates his equitable estoppel argument into his retaliation argument, the Court addresses the issue there, *see supra* Part III.B.iii.

### IV. CONCLUSION

For the above stated reasons, **IT IS HEREBY ORDERED** that Defendant National Railway's Mot. for Summ. J., Dkt. 8, is **GRANTED IN PART** and **DENIED IN PART**. A telephonic status conference is scheduled for **November 23, 2021**, at **9:00am Central Standard Time**. The Court will place the call to counsel.

**IT IS SO ORDERED**

*Thomas B. Russell* (signature)

Thomas B. Russell, Senior Judge
United States District Court

November 16, 2021